Scott D. **LEWIS**, Plaintiff,

v.

**OHIO PROFESSIONAL ELECTRONIC, NETWORK LLC,** et al., Defendants.

No. C2-00-1131.

United States District Court, S.D. Ohio, Eastern Division.

March 27, 2002.

Syliva M Antalis, Murray & Murray, Sandusky, OH, Brian K Murphy, Murray Murphy Moul & Basil, Columbus, OH, for Scott D. Lewis.

Andrew J Dorman, Janik & Dorman, Cleveland, OH, William J. Muniak, Janik & Dorman, Cleveland, OH, for Ohio Professional Electronic Network LLC.

Craig Alan Smith, Gamble Hartshorn & Johnson Co LPA, Columbus, OH, Melissa

Veronica Mahoney, Gamble Hartshorn Johnson Co LPA, Columbus, OH, for The Buckeye State Sheriff's Ass'n.

Irving Barry Marks, Columbus, OH, for Central Mortgage Inc., Equibane Mortgage Corp.

## ORDER AND OPINION

MARBLEY, District Judge.

This matter is before the Court on cross-motions for summary judgment filed by Defendant Buckeye State Sheriffs' Association on July 12, 2001, by Plaintiff Scott D. Lewis on October 25, 2001, and by Defendants Ohio Professional Electronic Network LLC and Buckeye State Networks LLC on November 20, 2001.[1] Oral argument was heard on February 22, 2002. For the following reasons, the Court **GRANTS** the Motion for Summary Judgment of Defendant Buckeye State Sheriffs' Association in part and **DENIES** it in part; **GRANTS** the Plaintiff's Motion for Summary Judgment; and **DENIES** the Motion for Summary Judgment of Defendants Ohio Professional Electronic Network LLC and Buckeye State Networks LLC.

### I. STATEMENT OF FACTS

In 1989, Defendant Michigan Sheriffs' Association ("MSA") decided to create a computer network to facilitate the sharing of information regarding bookings, arrests, and releases occurring at the county jails. To achieve this objective, M.S.A. § formed a not-for-profit corporation, Defendant Michigan Sheriffs' Jail Linkage System ("MSJLS"). MSJLS then hired R.W. Hannah Associates ("Hannah") to implement the jail linkage data processing system at the MSJLS Data Center. Han-

---

1. On November 20, 2001, Defendants Ohio Professional Electronic Network LLC and Buckeye State Networks LLC filed a memorandum that was both in opposition to Plaintiff's motion for summary judgment and in support of said Defendants' motion for summary judgment. Later that day, Defendants filed a Motion for Leave to File for Summary Judgment with their proposed motion attached thereto. The Court grants leave for Defendants to file for summary judgment, and considers their arguments herein.

nah's only client during this period was MSJLS, and all of Hannah's activities were overseen by MSJLS.

Initially, participating sheriffs' offices were to submit data to MSJLS in a generic format used by the computer programs already in use at those offices. As time progressed, however, more information was desired and MSJLS directed Hannah to modify the computer program to allow more categories of information to be communicated to the MSJLS database. Eventually, a system was developed that allowed 476 categories of information to be shared via the MSJLS computer network.

In 1991, the MSJLS computer network expanded to include the Ohio sheriffs. At this time, MSJLS became a joint venture of M.S.A. § and Defendant Buckeye State Sheriffs' Association ("BSSA"). Subsequently, BSSA Executive Director, Robert Cornwell, became the Project Director of MSJLS, and the MSJLS offices and data center were moved from Lansing, Michigan to Columbus, Ohio. In 1994, MSJLS decided to make what it determined to be "Public Arrest Data" available to the general public. Among the information made available were inmates' full names, dates of birth, social security numbers, dates and times of bookings, as well as the dates, times, and reasons for the inmates' release.

In January 1998, Defendant MSJLS entered into an Information Services Agreement with Defendant Ohio Professional Electronic Network ("OPEN").[2] This agreement provided OPEN access to the MSJLS information, but conferred upon OPEN no legal rights in any information or records compiled or provided by MSJLS. Subsequently, in May 1998, Buckeye State Networks, LLC ("BSN")

entered into an Exclusive Distributorship Agreement with MSJLS, which made BSN the "Exclusive Distributor to distribute and provide access to the data to private sector non-governmental users...." To facilitate this arrangement, BSN assumed the rights of MSJLS regarding the sale of access to arrest information to OPEN. Thus, anyone who wished to have access to MSJLS' information, including OPEN, had to obtain it through BSN.

Plaintiff Scott Lewis ("Lewis") claims that in March 1998, while employed by Three Rivers Option Care ("Three Rivers"), he decided to pursue actively other employment opportunities. To that end, Plaintiff asserts that he interviewed with HillMed Home Medical Systems ("HillMed"). Plaintiff further alleges that after the interview he was informed that once certain routine hiring procedures were completed, including a background check, he would be offered a position with HillMed. After two weeks passed with no contact from HillMed, Plaintiff decided to contact them regarding his status, yet none of his calls was accepted by the person who interviewed him. Plaintiff alleges that during one of his contacts with HillMed, an employee referred to him as an "unsavory character" and indicated that if he attempted to contact HillMed again the police would be notified. Soon thereafter, Plaintiff was forced to resign his position with Three Rivers. According to Lewis, Three Rivers cited poor performance as the reason for its demand of his resignation, despite his positive performance review only weeks before.

Plaintiff claims that, through the use of Defendant BSN (the exclusive distributor), Defendants OPEN, Arresting Info., and

2. The text of the Information Services Agreement identifies the parties as the Sheriffs' Jail Linkage System, Inc. ("SJLS") and the Ohio Professional Electronic Network, LLC, and makes no mention of MSJLS. The parties, though, have treated SJLS as MSJLS in their respective motions, and the Courts does the same.

Intellicorp have accessed and/or sold inaccurate criminal history information regarding Plaintiff that is stored in the MSJLS database to his potential employers, thereby hindering his search for employment. Specifically, Plaintiff contends that this false information was revealed to HillMed and then to Three Rivers. Plaintiff claims that Three Rivers admitted that it was contacted by HillMed and was told by HillMed that Plaintiff was an "unsavory character." Consequently, Lewis was forced to resign from Three Rivers.

Defendants OPEN and BSN claim that Plaintiff never interviewed with HillMed. Defendants cite the Affidavit of HillMed's Secretary, Ms. Graham, stating that "HillMed never interviewed Scott D. Lewis [and,] never conducted a background check on [him]."[3] Ms. Graham also asserts that HillMed did not use OPEN or BSN to conduct criminal background checks and that HillMed, in fact, has never utilized the services of OPEN or BSN.

Plaintiff states that, after months of searching for employment with no success, he engaged a private investigator to determine the reason for his repeated rejections. The investigator conducted a criminal background check on Plaintiff, which, according to Lewis, produced a record consisting of various felony convictions, including a 1996 murder conviction, all of which properly belong to Timothy Lockhart. Plaintiff contends that whomever entered Mr. Lockhart's arrest data entered the last four digits of his telephone number as the last four digits of his social security number. This error resulted in Mr. Lockhart's information being entered under Plaintiff's social security number.

Thus, any third party who did a search using Plaintiff's social security number would retrieve Mr. Lockhart's criminal history. Defendants OPEN and BSN state that Mr. Lockhart was not actually arrested for murder until September 16, 1998. Defendants claim that the murder arrest, therefore, could not have had any deleterious affect on Plaintiff's job search in March of 1998. Lewis asserts that he has never been charged or convicted of any felony, let alone murder. Plaintiff claims that this erroneous criminal background accounts for his failure to find employment, and asserts that he has suffered emotionally as a result.

## II. PROCEDURAL HISTORY

On September 27, 2000, Plaintiff commenced the instant action against Defendants OPEN, and Richard Dohner and Don Smith d/b/a the Buckeye State Sheriff's Association, claiming that he is entitled to relief from Defendants, pursuant to the Fair Credit Reporting Act ("FCRA" or "the Act").[4] On December 13, 2000, Plaintiff filed his First Amended Complaint, replacing Defendant Richard Dohner and Don Smith d/b/a the Buckeye State Sheriff's Association with Defendant BSSA. On August 17, 2001, Plaintiff filed a Second Amended Complaint, adding Defendants BSN, MSA, MSJLS, Arresting Info, Intellicorp, and Fact Finders. On October 23, 2001, Plaintiff filed a Notice of Voluntary Dismissal pursuant to Fed.R.Civ.P. 41(a), dismissing Defendant Fact Finders. Plaintiff alleges that the remaining Defendants have violated: (1) the procedural requirements of FCRA § 1681e(b); (2) the disclosure requirements of FCRA § 1681g; (3) the investigation requirements of

---

**3.** Plaintiff states that although the name of the individual with whom he interviewed was provided to Defendants, the Affiant, Ms. Graham, is not that individual. Plaintiff further contends that Ms. Graham does not identify any basis for her knowledge that HillMed did

not interview Plaintiff or offer him a job and indicates that, as such, the Affidavit may be legally deficient.

**4.** 15 U.S.C. § 1681 *et seq.*

FCRA § 1681i; and (4) the notice requirements of FCRA § 1681k regarding requests for public record information. In response, BSSA filed a motion for summary judgment on July 12, 2001, asserting that BSSA is not a consumer reporting agency, as that phrase is defined by FCRA, and thus is not subject to the Act's requirements. Plaintiff filed for summary judgment on October 25, 2001, seeking a declaration that FCRA applies to Defendants OPEN and BSN. Defendants OPEN and BSN also filed for summary judgment on November 20, 2001.

## III. STANDARD OF REVIEW

In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir.1994). Significantly, "[t]he filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir.1991) (citing *John v. State of La. (Bd. of Trustees for State Colleges & Univ.)*, 757 F.2d 698, 705 (5th Cir.1985)).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248. Summary judgment is therefore appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any materi-

al fact and the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## IV. ANALYSIS

### A. Motion of Defendants BSSA, MSA, and MSJLS for Summary Judgment[5]

Defendants assert that they do not qualify as consumer reporting agencies under FCRA, and thus are not subject to its mandates. Specifically, BSSA and M.S.A. § contend that they do not assemble or

---

5. Defendant BSSA's original Motion for Summary Judgment, filed on July 12, 2001, was solely on behalf of BSSA. On August 17, 2001, Plaintiff filed his Second Amended Complaint, adding Defendants M.S.A. § and MSJLS. Subsequent to that filing, Defendant BSSA filed its Reply Memorandum, which seeks summary judgment on behalf of all three of these Defendants.

evaluate the arrest data information, do not compile the information into consumer reports, and do not transmit information to those who would rely upon it in deciding whether to extend credit or offer employment. Furthermore, Defendants claim that the Affidavit of Robert Cornwell establishes that MSJLS disseminated the public arrest data, not BSSA or MSA. Thus, Defendants assert that BSSA and M.S.A. § should be dismissed from the instant action.

Defendants further contend that Plaintiff has failed to produce any evidence tending to show that, at the time relevant hereto, Defendant MSJLS was a "consumer reporting agency," or that MSJLS was providing "consumer reports" to the information companies with whom it had contracted. Alternatively, Defendants assert that, because MSJLS is wholly owned by BSSA and MSA, it is owned by the Ohio and Michigan sheriffs. Thus, according to Defendants, the public arrest data is specifically excluded from the FCRA.

■ The Fair Credit Reporting Act is remedial legislation, which is to be liberally construed in favor of consumers. *See Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961 (6th Cir.1998). Simply stated, FCRA regulates the communication of consumer reports by credit reporting agencies. 15 U.S.C. § 1681 *et seq.* The Act places specific requirements upon individuals and entities that qualify as consumer reporting agencies when they communicate consumer information that constitutes a "consumer report" under FCRA. *Id.*

■ A "consumer reporting agency," for purposes of FCRA, is defined as:

any person [6] which, for monetary fees, dues or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating ... information on consumers [7] for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). Thus, an entity can be deemed a consumer reporting agency if four factors are satisfied: (1) it acts in exchange for compensation of the kind described; (2) it "regularly" "assembles" or "evaluates" information on consumers; (3) its purpose in doing so is to furnish consumer reports; and (4) it utilizes interstate commerce in the preparation or furnishing of a consumer report. *Id.* The requirement that a consumer reporting agency "assemble or evaluate" the consumer information "implies a function which involves more than receipt and retransmission of information ... [t]he Act is not directed to those who supply information ... [to] consumer reporting agencies, nor to those who are remote from those decisionmakers who rely upon consumer reports in making credit and other decisions." *Smith v. First National Bank of Atlanta*, 837 F.2d 1575 (11th Cir.1988) (internal citations omitted).

■ A further requirement which must be satisfied in order to qualify as a consumer reporting agency under the Act is that the individual or entity must "regularly engage, in whole or in part" in the practice of assembling or evaluating consumer information. As FCRA does not define the term "regularly," at least one

---

**6.** "Person" is defined broadly by FCRA as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).

**7.** "The term 'consumer' means individual." 15 U.S.C. § 1681a(c).

United States District Court has looked to the Fair Debt Collection Practices Act ("FDCPA") for guidance. *See Johnson v. Federal Express Corp.*, 147 F.Supp.2d 1268 (D.Ala.2001). In *Johnson,* the court found that since FCRA and FDCPA contain similar language and are both intended to protect consumers, it would be appropriate to look to FDCPA for guidance in interpreting the provisions of FCRA. *Id.* at 1275. Thus, the court in *Johnson* relied upon a case in which the Sixth Circuit considered FDCPA's definition of the term "regularly." *Id.* Relying on Black's Law Dictionary, the Sixth Circuit defined the term as "at fixed and certain intervals, regular in point of time. In accordance with some consistent or periodical rule of practice. The term regular means usual or customary, normal or general. . . ." *Id.* (citing *Schroyer v. Frankel,* 197 F.3d 1170, 1174 (6th Cir.1999)). Congress was concerned with consumer reporting agencies that played a "vital role in assembling and evaluating . . . information on consumers." 15 U.S.C. § 1681(a)(3). By ensuring that FCRA's applicability is limited to those who engage in the assembling or evaluation of consumer information "in accordance with some consistent . . . practice," FCRA serves to regulate only those parties whose role is "vital."

### 1. Defendants BSSA and MSA

■ Defendants BSSA and M.S.A. § assert that they are not "credit reporting agencies" as they do not assemble, evaluate, or compile the arrest data information. Defendants further claim that they do not transmit the information to those who would rely on it in deciding to extend credit or offer employment. The record supports these Defendants' arguments, and this Court agrees with Defendants' analysis. Tellingly, Plaintiff has failed to respond to these assertions.

The Court, therefore, **GRANTS** Defendants' Motion for Summary Judgment as to Defendants M.S.A. and BSSA.

### 2. Defendant MSJLS

It is not contested that Defendant MSJLS received money payments from third parties in exchange for access to its database of public arrest information. Likewise, it is uncontested that MSJLS utilized some form of interstate commerce in the transmission of its information to those third parties. The issues before this Court are whether MSJLS satisfies the two remaining prongs of FCRA's definition of credit reporting agency: (1) whether MSJLS regularly assembles or evaluates information on consumers; and (2) whether its purpose in doing so is to furnish consumer reports.

### (a) The Regularly Assemble Requirement

■ The Court finds that MSJLS regularly assembled the information stored in its database with the intention of selling it to third parties. Mr. Cornwell described the operation of the database and stated in his deposition that information is sent from the sheriff's departments to the data center via telephone lines and that, upon receipt, the data center "reassembles the information and stores it in the main database." The record indicates that MSJLS monitored and limited the information that others were able to access.

The term "assemble" requires more than mere receipt and transmission of information. In the matter *sub judice,* MSJLS receives much more information than it allows the parties, with whom it has contracted, to access. The other sheriff's offices are entitled to access all of the information, while the non-governmental third parties can access only certain information that MSJLS determines to be "public arrest data." The question then becomes whether this partitioning of the

information is sufficient to satisfy the "assemble" requirement of FCRA. In the absence of a statutory definition of the term "assemble," the Court will look to its plain meaning.

The word assemble means "to bring or summon together in a group ... to bring together ... to put or join together ... in an orderly way...." *Webster's Third New International Dictionary of the English Language* 131 (1993). It would seem, then, that by gathering certain information together in order to limit the access provided to third parties, MSJLS has "assembled" the information sent to it by the participating sheriff's offices. Defendant argues, however, that its inability to alter the data it receives from the sheriff's offices prevents it from qualifying as an assembler or evaluator of that information. As stated previously, however, one who assembles information does not necessarily change its contents. The definition only requires that the assembler gather or group the information. Here, information deemed to be public arrest data was grouped together into a database that third parties could access. That action is sufficient to satisfy the "assemble" requirement of FCRA. Furthermore, it is also true that MSJLS "regularly engaged" in this activity. MSJLS had a data center that was to identify the public arrest data information and separate it from the other information received, such that the third parties were only able to access it. Thus, Defendant MSJLS did regularly engage in the assembling of consumer information.

### (b) The Purpose Requirement

■ The next inquiry is whether Defendant MSJLS regularly assembled this consumer information *with the purpose of furnishing consumer reports to third parties.* Based on Mr. Cornwell's deposition, MSJLS knew and in fact intended for parties such as potential employers and insurance companies to access the public arrest data information, and that the information might be used in employment and other decisions. But MSJLS itself did not intend to contract with those parties to provide such access. MSJLS instead contracted with other entities such as BSN and OPEN to provide that access. This, however, is not enough to escape qualification as a consumer reporting agency. The system functioned by third parties connecting with OPEN or BSN, and then choosing to access MSJLS. The third party would then be connected directly with the MSJLS database. The information was not received from OPEN or BSN, but from MSJLS. This is how it was supposed to function, and how MSJLS intended it to work. Defendant MSJLS did assemble this public arrest data for the purpose of furnishing it to third parties. Thus, if that information qualifies as a consumer report under FCRA, Defendant MSJLS would be deemed a consumer reporting agency subject to the mandates of FCRA.

### (c) Consumer Reports

FCRA defines a consumer report as:

any ... communication of any information by a consumer reporting agency bearing on a consumer's creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... [consumer] credit or insurance ... employment purposes; or [other authorized purposes].

15 U.S.C. § 1681a(d)(1). Thus, in order to qualify as a consumer report for the purposes of FCRA, the communication must be (1) made by a consumer reporting agency; (2) regarding one of the specified attributes of the consumer; and (3) used, expected to be used, or collected in whole or in part, for one of the three purposes

delineated in the definition. *Id.; see also Cheatham v. McCormick*, 100 F.3d 956 (6th Cir.1996). Specifically exempted from this definition, however, are "report[s] containing information solely as to transactions or experiences between the consumer and the person making the report," as well as "communication[s] of that information among persons related by common ownership or affiliated by corporate control." 15 U.S.C. § 1681a(d)(2)(A)(i), (ii).

If the information at issue herein qualifies as a consumer report, MSJLS will be deemed to be a consumer reporting agency. To qualify as a consumer report, the information contained therein must bear on an individual's "creditworthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. § 1681a. Defendants do not dispute that the information at issue touches upon these characteristics of Plaintiff. Instead, Defendant MSJLS asserts that the status of the information is somehow limited by the fact that MSJLS only provides information to sheriffs and the three companies with whom it had contracted, OPEN, Fact Finders, and Intellicorp. MSJLS further contends that because of MSJLS' relationship with M.S.A. § and BSSA, its communications are explicitly excluded from the definition of "consumer report" by FCRA.

 The Act provides that a communication of consumer information is a consumer report if it is (1) used; (2) expected to be used; or (3) collected in whole or in part for the purposes stated therein, including, *inter alia*, insurance and employment purposes. Mr. Cornwell stated in his deposition that Defendant MSJLS contracted with entities such as BSN with the expectation that the information would be accessed by parties such as potential employers and insurance companies, and that said information might be used in employment and other decisions. Although MSJLS itself did not intend to contract with those parties directly, but instead contracted with other entities such as BSN to provide that access, such an arrangement does not save MSJLS. All that is required is that MSJLS expected the information to be used or collected, in whole or in part, for employment or insurance purposes. The record establishes that it did. Furthermore, the record indicates that, although the third party access is obtained from OPEN or BSN, the end user actually accesses the information directly from MSJLS rather than from these access providers. Therefore, MSJLS collected the information with the expectation that it be furnished to third parties.

As the information does touch upon one of the characteristics listed in FCRA, and MSJLS either used, expected that information to be used, or collected the information to be used for, *inter alia*, insurance or employment purposes, the communication herein qualifies as a consumer report under FCRA.

**(d) The Transactions and Experiences Exception**

Defendant MSJLS argues that even if the information is found to satisfy the definition of a consumer report, it is still exempt under FCRA. The members of M.S.A. § and BSSA enter information regarding the bookings and arrests that occur at their respective county jails. The information is then sent to MSJLS, which is wholly owned by Defendants M.S.A. § and BSSA. Defendants claim that, because the information entered is "solely as to transactions or experiences between the consumer and the person making the report," the communication of such information is exempted and is not a "consumer report" for the purposes of FCRA. 15 U.S.C. § 1681a(d)(2). As MSJLS is wholly owned by BSSA and MSA, the communication of the information from BSSA and M.S.A. § to MSJLS is, according to Defen-

dants, exempted, because the communication is a record of the M.S.A. § or BSSA member's "transaction or experience" with the subject of that entry, and the subsequent communication of that information to MSJLS is a communication between "persons related by common ownership or affiliated by corporate control." *Id.* § 1681a(d)(2)(A)(ii).

■ The Court finds that it does not necessarily follow, however, that the subsequent communication of that information by MSJLS is likewise exempted. The Act does not provide that communications *by* those other than the one who had a transaction or experience with the consumer are exempted. The Act allows information to be communicated *between entities* connected by common ownership or corporate control without being subject to FCRA: "The term 'consumer report' does not include … any … report containing information *solely as to transactions or experiences between the consumer and the person making the report;* … [or any] communication of that information *among* persons related by common ownership or affiliated by corporate control...." 15 U.S.C. § 1681a(d)(2) (emphasis added). Yet, when the communication is no longer coming directly from the entity with which the consumer had a transaction or experience, and the communication is not going to another entity related by common ownership or control, the "transactions or experiences" exemption ceases to provide protection.

Plaintiff asserts that since he never actually had any "transactions or experiences" with the county jail, it is impossible for the entering of his social security number to be excluded under this section of the Act. There is no proof offered that the individual who entered Mr. Lockhart's social security number knew of his mistake. Thus, the record supports the conclusion that the information was entered upon the belief that the individual to whom the social security number belonged was the person with whom the jail had a "transaction or experience." It has been held that such a belief is sufficient to uphold an exemption per the "transaction or experience" exclusion of FCRA. *See Smith v. First National Bank*, 837 F.2d 1575 (11th Cir. 1988).[8] Since there is no evidence that the officer who entered Plaintiff's social security number knew it was incorrect, that officer was entering information solely as to the transactions or experiences between the consumer and the person making the report, the communication of which to others affiliated by common ownership or corporate control is exempted from the definition of consumer report by FCRA. *See* 15 U.S.C. § 1681a(d)(2)(A)(ii). But the question is whether MSJLS, wholly owned by M.S.A. § and BSSA, is shielded by the exemptions that rightfully belong to BSSA and MSA.

The seminal case on the "transactions or experiences" exception is *Hodge v. Texaco,* 975 F.2d 1093 (5th Cir.1992).[9] In *Hodge,*

---

**8.** In *Smith,* Plaintiff sued Defendant First National Bank under FCRA, alleging that it had reported her delinquent on a Visa account for which she had never applied. *Smith,* 837 F.2d at 1577. Plaintiff was seeking to avoid the same FCRA exclusion at issue herein by asserting that the information provided by the Bank to the credit reporting agency could not constitute a transaction between it and the consumer because Plaintiff was not a customer of the Bank. *Id.* at 1578. The District

Court, however, found that the Bank, until receiving notice of the forgery on the credit application, "believed [Plaintiff] was its customer and responsible for the delinquent account." *Id.* The Court of Appeals found that the district court properly applied the Act in deciding that these facts did not make the Bank's information a consumer report. *Id.*

**9.** In *Hodge,* Plaintiff was employed by Defendant Texaco. As part of employee evaluations, Texaco would employ the services of

the court clarified that "[t]he transactions and experiences provision exempts from coverage any report based on the reporter's first-hand experience of the subject." *Id.* at 1096. This view is supported by the Federal Trade Commission interpretive regulations, which provide that "as long as the report is not based on information from an outside source, but rather is based solely on the reporter's own first-hand investigations of the subject, the report will fall within the transactions and experiences exception." *Id.* (citing 16 C.F.R. Appendix, Part 600, at 600 (1991)). In the matter *sub judice*, MSJLS, a private entity, has had no experience with Plaintiff. Unlike *Hodge*, there is no employee at MSJLS who has any personal knowledge of the information provided, and everything is based upon the information that was sent to them by either BSSA or MSA. It is not based upon any independent examination by a MSJLS employee, but rather is based entirely upon the experiences of another.

The transactions and experiences exception has been applied in situations where a bank has provided information on a consumer that was based solely upon information contained in its own ledgers. *See, e.g., Smith,* 837 F.2d at 1579–80. Again, those cases are distinguishable from this situation. There, a bank relays its own experiences with a particular customer, having

no information from sources other than its own employees. *Id.* In this case, however, MSJLS is communicating information regarding the experiences that someone else, a non-employee, had with the consumer. Thus, the transactions and experiences exception is inapplicable to any communication of consumer information by Defendant MSJLS, and the information falls within the definition of a consumer report.

The Court, therefore, **DENIES** Defendants' Motion for Summary Judgment as to MSJLS.

### B. Motion of Plaintiff for Summary Judgment

Plaintiff's motion is limited to the threshold question of whether or not FCRA applies to Defendants OPEN and BSN. Plaintiff asserts that Defendants OPEN and BSN are consumer reporting agencies who, for a fee, furnish consumer reports to third parties, and seeks a declaration that OPEN and BSN are thus subject to the requirements of FCRA. Alternatively, Lewis claims that even if Defendants do not qualify as consumer reporting agencies, they are resellers of the consumer reports and their actions still fall within the purview of FCRA.

Defendants argue that they are not consumer reporting agencies, but rather "gateway access providers." Defendants maintain that they neither assemble nor

---

Mobile Health Services to perform drug testing of Texaco's employees. Plaintiff, after failing a preliminary screen, was required to submit to a urine test. The urine sample was sent to Laboratory Specialists, Inc. ("LSI") who reported to Texaco that the sample was positive for marijuana use. As a result of this information, Texaco suspended Plaintiff and initiated termination proceedings. Investigating further, Texaco's Executive Vice President arranged to have a portion of Plaintiff's urine sample sent to Dr. Tennant, who had helped Texaco develop its drug policies. Dr. Tennant then forwarded the sample to another lab, which confirmed that it tested positive. Upon

receipt of this information, Texaco terminated Plaintiff. In the portion of the opinion relevant hereto, the court considered whether the initial laboratory testing performed by LSI, the results of which were communicated to Texaco, would be exempted from FCRA's definition of "consumer report" under the "transactions or experiences" exception. The court found that the report was excluded because it was a communication of the first-hand experience of the laboratory employee and thus was "solely as to the transactions or experiences between the consumer [Plaintiff] and the person making the report [LSI]." *Id.* at 1096.

evaluate information as required by FCRA's definition of a consumer reporting agency. Defendants claim that, because the public arrest information remained the property of MSJLS and that neither OPEN nor BSN acquired any legal rights regarding the information, they are not resellers subject to FCRA.

### 1. Consumer Reporting Agencies

A consumer reporting agency, in exchange for fees, dues, or on a nonprofit cooperative basis, regularly engages in the assembling or evaluating of consumer information in order to furnish consumer reports to third parties, and utilizes some form of interstate commerce in order to provide those consumer reports. 15 U.S.C. § 1681a(f). It is uncontested that Defendants OPEN and BSN provide access to the MSJLS database in exchange for monetary compensation, and that the transmission of the information utilizes interstate commerce. Furthermore, it cannot be credibly asserted that Defendants OPEN and BSN do not "regularly" engage in such activity, as BSN and OPEN are the only entities which provide third party access to the MSJLS database. The question then is whether OPEN and BSN "assemble or evaluate" consumer information in order to furnish consumer reports.

 The only actions attributable to OPEN and BSN regarding the information involve the creation of a menu from which a subscriber can choose to be routed to the MSJLS database. Per their contracts with MSJLS, Defendants OPEN and BSN have no legal right to the information and do not enter, alter, or delete such information. Although this is not determinative, it is instructive considering the role Defendants play in the accessing of the MSJLS database. During the relevant time peri-od, Defendants functioned as the conduit through which third parties gained on-line access to the MSJLS database. OPEN and BSN do not group the information, nor do they view and evaluate the information provided by the MSJLS database. Thus, the Court finds that Defendants OPEN and BSN do not assemble or evaluate consumer information and are not consumer reporting agencies under FCRA.

The Court finds, however, that the transmission of public arrest information satisfies the definition of "consumer report" provided in the Act. Such data transmitted through a computerized network constitutes "any written, oral, or other communication ... bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living...." *See* 15 U.S.C. § 1681a(d)(1). Surely, a negative criminal history that includes a murder conviction has some bearing on an individual's character and general reputation, and such information may have been used for employment purposes in this case, as Plaintiff alleges.

### 2. Resellers

 The Court finds that even if Defendants OPEN and BSN are not consumer reporting agencies, they are still subject to FCRA as resellers of consumer information. The Act does not define resellers specifically, but provides that "a person who procures a consumer report for purposes of reselling the report (or any information in the report) shall [be subject to certain requirements under the Act.]" 15 U.S.C. § 1681e(e)(2). The Court notes that Richard Lippert,[10] OPEN's Chairman, admitted in his deposition that OPEN is a reseller. Furthermore, MSJLS granted BSN access to the information in its data-

---

**10.** Richard T. Lippert is currently the Chairman of OPEN, and was the Chief Executive Officer of OPEN from 1995 to 2001.

base for purposes of selling that information to third parties. Thus, based on its Exclusive Distributorship Agreement with MSJLS, BSN is also a reseller that is subject to FCRA. Tellingly, Defendants BSSA, MSA, and MSJLS concede as much.[11]

Defendants claim that in order to qualify as a reseller, a person/entity must first qualify as a consumer reporting agency. The plain language of the Act, however, does not support that conclusion. The Act frequently directs its mandates at consumer reporting agencies explicitly, yet the reseller provision was drafted using the phrase "a person," rather than "a consumer reporting agency." The term "person" is defined in FCRA as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b).[12] The Court is of the opinion that had Congress meant to cover only "consumer reporting agencies" under § 1681e(e)(2), it would have said so. Instead, Congress used the term "person."

The reseller provision is aimed at anyone who purchases a consumer report in order to resell it, not just consumer reporting agencies. It does not require that it be done regularly, and one can reasonably conclude that, although one who conducts such activity on a regular basis may be classified as a consumer reporting agency, this provision covers more. That is, it covers persons/entities that do not qualify as consumer reporting agencies under the Act.[13]

Defendants' contention that the Court must first find OPEN and BSN to be consumer reporting agencies before finding them resellers lacks merit. Defendants' interpretation of the reseller provision would effectively eviscerate the Act in this context. Based on Defendants' construction, a consumer reporting agency with nefarious intentions could establish an entity that bears none of the earmarks of a consumer reporting agency but operates the same way. This separate entity could then procure and resell consumer information without any regulation whatsoever under the Act, simply because it is not technically "a consumer reporting agency." Such a scenario is unacceptable, given that FCRA was meant to protect people such as Plaintiff. Thus, OPEN and BSN are subject to the requirements of the Act.

The Court, therefore, **GRANTS** Plaintiff's Motion for Summary Judgment as to

---

**11.** In their memorandum in support of their motion for summary judgment, Defendants state:

> MSJLS contracted with several existing information companies to resell the Public Arrest Data to the general public through the resellers' own computer networks. The first such reseller was ... BSN, which distributed the Public Arrest Data through an affiliated company ... OPEN. Later resellers included Arresting Info., Inc.; Intellicorp, Ltd.; and Fact Finders.

**12.** The Act specifically and separately defines a "consumer reporting agency" in § 1681a(f).

**13.** The Federal Trade Commission has not addressed this question directly in any of its advisory opinions. At least one FTC letter, though, suggests that consumer reporting agencies may be separate and distinct from resellers under 1681e(e)(2). *See* FTC Staff Opinion to A. Michael Rosen, June 9, 1998:

> [Section 1681e] of the FCRA imposes special obligations upon *entities* that purchase consumer reports for resale from a CRA, including a requirement that the reseller must provide the selling CRA with the identity of the reseller's user. This obligation exists regardless of whether the selling CRA requests the information.... The reseller must provide the actual identity of the person or entity that is receiving the report ... *the CRA or reseller* must provide the identity of the [third party] (emphasis added).

the applicability of FCRA to Defendants OPEN and BSN.

### C. Motion of Defendants OPEN and BSN for Summary Judgment

Defendants contend that Plaintiff has failed to prove a causal nexus between OPEN or BSN and his inability to procure employment, and therefore lacks standing to sue under the Act. Defendants further assert that the information about which Plaintiff complains was not prepared and/or furnished by OPEN or BSN, could not have been obtained through OPEN's gateway, and does not qualify as a consumer report. Defendants argue that, because the document supplied by Plaintiff was actually retrieved by a private investigator hired by him, and not by a prospective employer, that document does not satisfy the FCRA definition of a consumer report. Defendants claim that, because the only information listed on the report belonging to Plaintiff was his social security number, the document is not a consumer report as a matter of law as it contains only common identifying information. Defendants also maintain that no one would have believed that the information sheet retrieved reflected the criminal history of Plaintiff.

The Court finds that Plaintiff has raised issues of material fact sufficient to defeat Defendants' motion for summary judgment. Although full discovery has not been completed in this case, Lewis has addressed Defendants' contentions that there is no nexus between OPEN or BSN and his inability to find employment, and that the arrest information does not constitute a consumer report under FCRA.

First, the document that the private investigator sent to Lewis contains the notation "JLS 050" in the upper left-hand corner, which, according to Plaintiff, indicates that it came from OPEN and originated from the MSJLS system. Defendants, of course, disagree. Yet, this alone is a question of fact that is best left to a jury.

Second, Plaintiff point out that although no material containing the name "Scott Lewis" has been determined to have come from OPEN, Lewis' social security number appears on the document at issue. Plaintiff maintains that the MSJLS database can be searched by social security number. The fact that Lewis' social security number is used to conduct a criminal background check, rather than his name, does not negate the Court's finding that the arrest information at issue is, in fact, a "consumer report" pursuant to 15 U.S.C. § 1681a(d)(1). Finally, despite Defendants' contention, it is not clear whether an employer would have believed that the information sheet retrieved reflected the criminal history of Plaintiff. That, too, is a question of material fact that cannot be decided on summary judgment, but is more properly addressed by the wisdom of the jury.

The Court, therefore, **DENIES** the Motion for Summary Judgment filed by Defendants OPEN and BSN.

### V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motion for Summary Judgment of Defendant BSSA in part and **DENIES** it in part; **GRANTS** the Plaintiff's Motion for Summary Judgment; and **DENIES** the Motion for Summary Judgment of Defendants OPEN and BSN.

**IT IS SO ORDERED.**